REFUNDING BOARD OF ARKANSAS *v.* STATE HIGHWAY
AUDIT COMMISSION.

4-3467

Opinion delivered April 30, 1934.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellant.

*Paul E. Gutensohn, Horace Sloan* and *Walter L. Pope,* for appellee.

*Donham & Fulk, amici curiae.*

SMITH, J. The State Highway Audit Commission filed a complaint in the Pulaski Chancery Court against the Refunding Board of Arkansas, which contained the following allegations: After alleging the creation of the Highway Audit Commission, and also that of the Refunding Board, and the functions of each, it was alleged that the People's National Bank had presented to the Refunding Board a certain Auditor's warrant in the sum of $2,500, which had been issued to a firm of contractors operating under the name of Altman-Rodgers Company. The warrant was dated April 30, 1932, and was directed to the State Treasurer. The complaint alleged that the warrant was issued to the contractors for construction work performed under a valid contract, upon a voucher

duly and legally issued by the Arkansas State Highway Commission, and was on the same date of its issuance indorsed and delivered to the People's National Bank, in the due course of business and for value.

It was alleged that, although the warrant constituted a valid obligation on the part of the State, it should not be refunded, because the State has a claim against the Altman-Rodgers Company, which arose as follows: On August 27, 1930, a contract was entered into between the said Altman-Rodgers Company and Dwight H. Blackwood, at that time chairman of the State Highway Commission, whereby said Altman-Rodgers Company undertook to do and perform certain road construction work there described. The Altman-Rodgers Company performed said construction work and furnished material at an actual cost of $801.13. That contract was alleged to be invalid and without legal and binding effect because it involved the payment of more than a thousand dollars, and was not advertised or let on competitive bidding, nor was it executed by at least three members of the Arkansas State Highway Commission, as required by law, nor was it attested by the Secretary of the Commission, as required by law, and for each and all of these reasons was unenforcable as a contract.

The Altman-Rodgers Company was paid by the State, upon voucher issued by the State Highway Commission and warrants issued thereon by the State Auditor, in the sum of $1,411.62. By reason of the fact that the fair and reasonable cost of the labor done and material furnished on said contract was only $801.13, the said Altman-Rodgers Company was overpaid in the amount of $610.49. Final estimate was made by the State Highway Engineer of the work on November 6, 1930, on which date the State Highway Commission approved the work and accepted it, and on said date paid the full amount of $1,411.62 under said irregular and invalid contract. By reason of this overpayment the Altman-Rodgers Company was indebted to the State in the sum of $610.49 on the date on which it received the $2,500 warrant, and is still so indebted, which said in-

debtedness the State is entitled to setoff against said $2,500 warrant.

It was alleged that, although the Bank had received the $2,500 warrant without actual knowledge of the facts here recited, it was charged with knowledge of the set-off in favor of the State and took said $2,500 warrant charged with all equities, defenses and set-offs in favor of the State against it.

It was alleged that the State Refunding Board is about to allow the full amount of said $2,500 warrant to the People's National Bank, under the provisions of act 11, passed at the Extraordinary Session of the General Assembly and approved February 14, 1934, and is about to authorize the payment of fifty per cent. of said warrant in cash and issue bonds, under the terms of said act, for the remaining fifty per cent. Special Session Acts 1934, page 28.

Complainants alleged that they constitute a Commission created by law and charged with the duty of detecting irregularities in connection with the operation of the State Highway Commission, and as such, and also as citizens and taxpayers, are interested in the action about to be taken by the Refunding Board, and that they have no adequate remedy at law to prevent the action the said Board is about to take.

Wherefore they pray that the Refunding Board be prohibited. and enjoined from permitting said $2,500 warrant to be refunded until there is definitely decided by the Audit Commission, or by a court of competent jurisdiction, the amount of overpayment, if any, made by the State on the invalid and irregular contract entered into between the State Highway Commission and Altman-Rodgers Company on August 27, 1930.

A demurrer to this complaint was filed, upon the ground that it did not state facts sufficient to constitute a cause of action, or to entitle the complainants to the relief prayed, or to any relief. The demurrer was overruled, and, respondent announcing that no further pleadings would be filed, it was ordered that the Refunding Board be prohibited and restrained from allowing the

$2,500 warrant until it is determined, either by the State Highway Audit Commission, or a court of competent jurisdiction, what amount, if any, the State is entitled to recover from Altman-Rodgers Company by reason of the irregular and invalid contract entered into between said company and the State Highway Commission on August 27, 1930.

It is unnecessary to review the legislation creating the State Highway Audit Commission and the Refunding Board of Arkansas, as their respective functions are not called into question. Other questions are decisive of the issue raised by the demurrer.

The recent case of *State of Arkansas* v. *Rogers & Jones,* cited and relied upon by appellant decided by the Supreme Court of Tennessee, does not appear to have yet been officially published. In that case the complaint alleged that a contract had been let to repair the approach to the Harahan Bridge over the Mississippi River, at the contract price of $393,706.57, whereas the actual and reasonable value of the work done and services performed under the contract was only $167,688.93. The complaint alleged that the contract had been let in violation of act 65 of the Acts of 1929, page 264, which act provided that all contracts in excess of a thousand dollars should be let on a competitive basis, after advertisement, to the lowest responsible bidder, and should be signed by at least three members of the State Highway Commission, whereas the contract there in question had been undertaken and signed by the Engineer of the Highway Commission alone, and had not been advertised for letting on a competitive basis to the lowest responsible bidder, as the act required should be done. An amendment to the complaint was filed which recognized the right of the defendant contractors to retain, by way of *quantum meruit,* the reasonable value of the services performed in the repair of the approach to the bridge.

The Supreme Court of Tennessee recognized and stated that the case was controlled by the law of this State, but interpreted certain decisions of this court, there cited, as holding that the contract, having been fully

performed, and the agreed consideration having been paid upon the work being accepted by the commission, there could be no recovery in the absence of specific allegations of fraud in letting the contract. The court said that: "To be regarded as a badge of fraud, the consideration for a contract must be so grossly excessive or so grossly inadequate as to shock the conscience of the court," and the allegation that $393,706.57 had been paid to perform work reasonably worth only $167,689.93, in the absence of other or specific allegations of fraud, was not regarded as sufficient to meet the test stated.

The court cited as the basis of its decision the following Arkansas cases: *Leonard* v. *State,* 185 Ark. 998, 50 S. W. (2d) 598; *Arkansas State Highway Commission* v. *Keaton,* 187 Ark. 306, 59 S. W. (2d) 481; *Forrest City* v. *Orgill,* 87 Ark. 389, 112 S. W. 891; *Shackleford* v. *Thomas,* 182 Ark. 797, 32 S. W. (2d) 810.

It was held by this court, in the case of *Forrest City* v. *Orgill, supra,* that, although a purchase by municipal officers of machinery for waterworks, which was not authorized by an ordinance, resolution or order of the city council, wherein the yeas and nays were called and recorded, and which was not ratified by any formal action of the city council, was not binding upon the city, yet, the city could not retain such machinery, which could have been purchased in a proper manner, and at the same time defeat a recovery for the contract price thereof.

In the case of *Shackleford* v. *Thomas, supra,* it was held that a school district, having made payments under a contract not executed in the mode prescribed by law, was estopped from recovering back such payments.

The other two cases will be later referred to and discussed.

It will be observed that, in the two cases first above cited and quoted from, the governmental agencies held to be estopped by the acceptance of services or the subject matter of the contract were, in one case, a city of the State, and, in the other, a school district, but the State itself was not a party to either case. We are of

the opinion that a wholly different rule is to be applied when the State itself is a party, for the reason that the doctrine of estoppel is not applicable to and cannot be applied against the State.

With all deference to the great court and the able members thereof who failed to recognize this distinction, we may say that all the members of this court are of the opinion that the distinction exists. Upon this point we are all agreed. Our difference arises out of the question to be later discussed.

At § 993 of Bishop on Contracts (Second Enlarged Edition), page 419, it is said: "The government is never estopped, as an individual or private corporation may be, on the ground that the agent is acting under an apparent authority which is not real; the conclusive presumption that his powers are known rendering such a consequence impossible. So that the government is bound only when there is an actual authorization. And this principle may extend to the agent of a municipal corporation and his contract, but it does not necessarily; as to which, the distinctions in the differing cases will be obvious."

The authorities on this subject were reviewed in the case of *State* v. *Chilton*, 49 W. Va. 453, 39 S. E. 612, in which it was sought to invoke the doctrine of estoppel against the State. It was there said: "A public officer cannot ratify expressly his own unauthorized act, and surely cannot do so by mere implication. *State* v. *Hays*, 52 Mo. 578; *Dalafield* v. *State*, 26 Wend. 192. Having no power to make credit sales, by his own knowledge that he did make them, neither he nor his predecessors could by that knowledge ratify the acts to protect themselves against the State demands. Estoppels do not generally bind a State; that is, estoppel by conduct of its officers. 'Clearly, the State cannot be estopped by unauthorized acts of its officers.' Bigelow, Estop. 341; *U. S.* v. *Kirkpatrick*, 9 Wheat. 735, 9 L. Ed. 199."

In the case of *Leonard* v. *State*, *supra*, a suit was brought to enjoin the State Auditor from issuing and the

Treasurer of the State from paying, certain vouchers issued by the State Highway Commission, in payment of contracts in excess of a thousand dollars, which had been let without advertising for bids, as required by act 65 of the Acts of 1929, volume 1, acts 1929, page 264. It was there held that the authority of the State Highway Commission to let contracts for construction or maintenance of highways is statutory, and any contract not let in the prescribed manner is unauthorized and voidable at the State's election. It was there also held, in a suit to enjoin the issuance and payment of vouchers based upon such illegal contracts, that relief might be granted without joining the claimants as parties to the suit.

Much of the relevant legislation was reviewed in the case of *Arkansas State Highway Commission* v. *Keaton, supra.* In that case a suit was brought and a judgment recovered against the State Highway Commission for the value of certain labor performed and materials furnished in the construction of bridges which were a part of the State highway system. The contract was similar to the one sued on in the case of *Leonard* v. *State, supra,* and upon the authority of that case we held that it was unenforcible as such, for the reason that it had not been let in the manner and form prescribed by law. We held, however, as had been previously held in the case of *State Highway Commission* v. *Dodge,* 186 Ark. 640, 55 S. W. (2d) 71, that the State, having accepted and being in possession of the results of a performed contract, could be held liable, on a *quantum meruit* basis, for the value of the materials furnished or the services performed, this right being conferred by act No. 2 of the Special Session of 1928. Acts Special Session 1928, page 2.

It was pointed out in the Keaton case, *supra,* that at the time of the rendition of the opinion in the Dodge case, *supra,* it had not been decided whether § 17 of act No. 15, passed at the Second 1932 Extraordinary Session of the General Assembly (page 34), was valid legislation or not, as being within the call of the Governor convening that session. But, before the rendition of the

opinion in the Keaton case, it had been decided, in the case of *State Note Board* v. *State ex rel. Attorney General*, 186 Ark. 605, 54 S. W. (2d) 696, that the act 15 was within the Governor's call, and that § 17 thereof authorized the maintenance of these suits on a *quantum meruit* basis. But it was said in the Keaton case that: "This § 17 recognized that there were outstanding many claims against the highway commission which had not been adjudicated or paid, and authorized the State Note Board to issue notes in payment, with the proviso, however, that '* * * this act shall not validate any claim, voucher or warrant or other evidence of indebtedness issued under or pursuant to an illegal contract, and provided further, that no note or notes shall be issued in lieu of any such claim in excess of $150 where such claim is based on a cost plus contract or a contract not let on competitive bidding until such claim is approved and the issuance of such notes are [is] authorized by the State Highway Audit Commission, or until the validity of such claim is finally adjudicated and determined by a court of competent jurisdiction.' "

We there also said that we were unaware of any legislation which had repealed § 17, from which we quoted, either expressly or by necessary implication, although the provisions of that section, with respect to the manner of payment of those claims appear to have been changed by the provisions of act No. 167 of the Acts of the 1933 Session of the General Assembly, which was approved March 28, 1933, and, having an emergency clause, became a law on that date.

These cases—the Dodge and the Keaton cases—appear to decide very definitely that a recovery might be had on these various claims and warrants on a *quantum meruit* basis, but on that basis only.

It appears with equal clearness to the majority that the legislation there reviewed did not operate to waive the State's right to set-off against any claim, or voucher, or warrant, or other evidence of indebtedness, issued under or pursuant to an illegal contract, such as the one

here involved and sought to be set-off is alleged to be, a fact which the demurrer concedes.

Now, if the original contractors, to whom the warrant here in question was issued, had brought suit to enforce their demand, it is certain that § 1197, Crawford & Moses' Digest, confers the right to apply any set-off which the State might have against it. This section reads as follows: "A set-off may be pleaded in any action for the recovery of money and may be a cause of action arising either upon contract or tort. Civil Code, § 119, as amended by act March 21, 1917, p. 1441."

In construing this section in the case of *Futrall* v. *McKennon,* 187 Ark. 377, 59 S. W. (2d) 1035, we said of it: "Act 267 of the Acts of 1917 (vol. 2, Acts 1917, page 1441) is the most comprehensive legislation on the subject of counterclaim and set-off of which we have any knowledge. It is there provided that a counterclaim 'may be any cause of action in favor of the defendants, or some of them, against the plaintiffs, or some of them,' and that 'a set-off may be pleaded in any action for the recovery of money, and may be a cause of action arising either upon contract or tort.' We think this statute is sufficiently broad to admit a defense against one, not being the holder of a note in due course, that there were credits which should be applied against the note."

It will be observed that it was there held that the right of set-off, under this statute, was sufficiently broad to admit a defense against one, not being the holder of a note in due course, that there were credits which should be applied upon a note of which the holder thereof had not received the benefits.

The bank, which is alleged to be the holder for value of the warrant here in issue, is in no better attitude than was the holder of the note there sued on. Indeed, the concession is here expressly made that warrants, orders, and certificates of indebtedness issued by the State, or, for that matter, by a county or a municipality, are not negotiable in the sense of the law merchant so as to cut off, in the hands of a *bona fide* purchaser for value or holder in due course, any defense

which might have been made against them had they remained in the hands of the original holder. That this is the law is definitely settled. *Vale* v. *Buchanan*, 98 Ark. 299, 135 S. W. 848; *First Nat. Bank* v. *Whisenhurst*, 94 Ark. 583, 127 S. W. 968; *Harriman Nat. Bank* v. *Pope County*, 173 Ark. 245, 292 S. W. 133.

So, therefore, the bank has those rights—and those only—which Altman-Rodgers Company might now assert if they had never assigned the warrant or voucher, or if it were reassigned to them, and we conclude, therefore, that the right of set-off, which the State seeks to assert, exists and should be accorded.

It is insisted, however that the State may ratify, and has ratified, these unauthorized contracts to the extent that they cease to be the subject of a set-off and has directed its agents to pay all claims otherwise valid, and the correctness of this contention is the controlling point of difference between the majority and the minority of the court. The majority concedes that the State may ratify these contracts and direct the payments of warrants issued under them, but we insist that it has not done so.

It is the opinion of the majority that this has not been done, and that the State has only authorized the payment of valid claims. If it was intended that all claims, whether valid or not, should be paid, the Audit Commission has been deprived of one of its chief functions. Why audit a claim if it must be paid, whether valid or not? It appears that the legislation was not so construed in the Keaton case, *supra,* where we said, as has been stated, that § 17 of act 15 of the Special Session of 1932 recognized that there were outstanding many claims against the Highway Commission which had not been adjudicated or paid, which that section authorized to be adjudicated and paid, provided that "this act shall not validate any claim, voucher or warrant, or other evidence of indebtedness, issued under or pursuant to illegal contracts." And we there said also that we were aware of no legislation repealing that section, expressly or by necessary implication, except

only with respect to the manner of payment of such claims as were adjudged to be valid. We held, in the Keaton case, that the claim there sued on did not have to be presented to the Refunding Board, not because the State had ratified all such contracts and had ordered them all paid, whether valid or not, but because a court of competent jurisdiction had, prior to the passage of act 167 of the Acts of 1933, passed upon its validity, and for that reason—but for that reason only—the Refunding Board had only the ministerial duty to perform of certifying the claim for allowance and exchange for a State bond.

Later legislation on the subject, which, it is insisted, evidences the intention of the State to ratify and to authorize payment of this warrant excluding the right of set-off, are act 18 of the Special Session of 1933, page 69, and act 11 of the Special Session of 1934, page 28.

We do not so construe this legislation, and we think that construction is not authorized when these acts are read in their entirety. Section 2 of act 18 authorizes the payment to be made "to the legal holders of valid claims against the Highway Commission," but § 1 of this act authorizes the Refunding Board, created by act 16 of the Acts of 1933, "to compromise or settle any suit or claim, either on behalf of the Arkansas State Highway Commission or against the Arkansas State Highway Commission, growing out of any contract between the Highway Commission and any person, firm or corporation for work, labor, materials, supplies or services, or arising out of any transaction between the Highway Commission and any member or employee thereof." And, as indicating that the State had not relinquished its right to continue the prosecution of any such claims as the one here involved, and in anticipation that some of these cases might be decided in favor of the State, it was further provided, in § 1 of act 18, that "Any funds due the Highway Commission from any settlement or compromise shall be paid into the State Treasury to the credit of the Bond Refunding Fund." And, finally, as if to make certain what might otherwise be doubtful, it

was provided in § 4 of act 18 that: "This act shall not validate any claim, voucher or warrant, or other evidence of indebtedness issued under or pursuant to an illegal contract, and no note except as provided in § 2 hereof shall be issued in lieu of any claim of $100 or more where such claim is based on a cost plus contract or a contract not let on competitive bidding until such claim is approved and the issuance of the notes authorized by the Refunding Board or until the validity of such claim is finally adjudicated and determined by a court of competent jurisdiction."

The only other act cited as sustaining the contention that the State had ratified these illegal contracts and warrants is act 11 of the Special Session of 1934, page 28. This is a most comprehensive act, consisting of fifty-five sections, and supersedes much of the prior legislation. It is entitled: "A Bill for an Act to be entitled: 'An Act to Refund Highway and Toll Bridge Obligations of the State and Road Improvement District Obligations; to Provide for the Payment and/or Funding of Certificates Issued in Aid of Municipal Improvement Districts; to Provide for the Funding and/or Payment of Claims Against the State Highway Commission, and for Other Purposes.' "

This act deals in minutest detail with the various obligations arising out of the State's entire road-building program. Section 15 of the act authorizes the Refunding Board, "in cases in which in the judgment of the board the best interest of the State will be served thereby, to refer to the Highway Audit Commission any note, bond or obligation presented to it for refunding hereunder, or any account or claim against the Highway Commission growing out of any contract between said Commission and any person, firm, or corporation, for work, labor, material, supplies or services, or arising out of any transaction between the Highway Commission, or any member or employee thereof, presented to the Refunding Board for payment or refunding under the provisions of this act." It is there further provided that: "It shall be the duty of the Highway Audit

Commission to investigate and make a full and complete report as to the validity of any such item referred to it by said Refunding Board; provided, however, that when a court shall determine the validity or invalidity of any such note, bond, obligation, account or claim, or whether or not it comes within the provisions of § 2 of act No. 11 of 1927, or of § 19 of act No. 65 of 1929, such adjudication shall be final and conclusive.''

But, before conferring the authority to investigate and adjudicate all such claims, it had been provided, in § 10 of act 11, that: ''This act shall not validate any claim, voucher, warrant or other evidence of indebtedness issued under or pursuant to any illegal contracts; no payments thereon or notes or bonds therefor shall be issued until such claim, voucher or warrant is approved by the Refunding Board or until its validity is finally determined by the Highway Audit Commission or by a court of competent jurisdiction. Provided that this act shall not affect the full termination of any litigation now pending in any of the courts as to the validity of any bonds now in litigation.''

Anticipating that the discharge of these duties would entail an expense, act 141 of the Acts of 1933, page 453, appropriated funds for protecting the State's interests in controversies arising by reason of the Highway Audit. In the preamble to this act it is recited that:

''WHEREAS, As a result of the Highway Audit there now exists a great many controversies between the State of Arkansas and contractors who dealt with the State Highway Commission prior to January 1, 1933, and a great many controversies growing out of payments of money on orders of the State Highway Commission to various and sundry persons, and

''WHEREAS, There are now pending suits brought by the State of Arkansas to recover such funds and other suits on behalf of contractors against the State Highway Commission, and

''WHEREAS, It is necessary for the State's interests to be properly protected that a fund be made avail-

able with which auditors and engineers may be used as witnesses, and

"WHEREAS, There is an unexpended balance to the credit of the appropriation made for the benefit of the State Highway Audit Commission in the sum of Thirty-three Thousand Nine Hundred Ninety-nine and no/100 ($33,999.00) Dollars."

In anticipation of this litigation, and in order that the State's rights might be fully protected, the sum of $33,999 was appropriated for these purposes.

We conclude therefore that while provision has been made for the payment of all valid demands against the State, the right of set-off has not been abandoned, and that the warrant here in suit is valid only to the extent of its face—as its validity is not questioned— less the State's right of set-off against it:

It is our opinion, therefore, that the decree of the court below is correct, and should be affirmed. It is so ordered.

MEHAFFY, McHANEY and BUTLER, JJ., dissent.

BUTLER, J., (dissenting). The majority opinion erroneously states: "It is insisted, however, that the State may ratify and has ratified these unauthorized contracts to the extent that they cease to be the subject of set-off, and has directed its agents to pay all claims otherwise valid, and the correctness of this contention is the controlling point of difference between the majority and minority of this court. The majority concedes that the State may ratify these contracts and direct the payment of warrants issued under them, but we insist that it has not done so.

"It is the opinion of the majority that this has not been done and the State has only authorized the payment of valid claims. If it was intended that all claims, whether valid or not, should be paid, the Audit Commission has been deprived of its chief function."

Later on the opinion refers to the subject-matter of this suit and the supposed contention of the minority in this way: "The only other act cited as sustaining that the State has ratified these illegal contracts," etc.

It is upon this premise that the majority bases its contention and found its argument in support of the conclusion "that, while provision has been made for the payment of all valid demands against the State, the right of set-off has not been abandoned."

With deference, I submit that the opinion misstates the position taken by the minority, misunderstands the contention of the appellant and rests upon a wholly false premise. The minority do not contend that the State "has ratified unauthorized contracts and has directed its agents to pay them." Neither do we admit that the warrants should be classed with "other illegal contracts," as the opinion seems to imply. On the contrary, we insist that the State has not attempted to ratify unauthorized contracts or warrants issued thereunder, but has only protected *bona fide* holders for value of valid warrants properly issued for just claims on legal contracts. That it, acting through its Legislature, has done this four times, we maintain.

It is apparent that the excerpts from the several acts quoted in the majority opinion are not persuasive of the contrary view, but support and affirm our contention. The purpose for the creation of the Audit Commission, with respect to that part of its duties relating to demands against the State, was to inquire into and audit those which were questionable, either as to amount or validity. Surely its services are not required with respect to a warrant issued for the correct amount and based upon a claim arising out of a valid contract when there is no contention otherwise but which is expressly admitted.

Section 1 of act No. 18, p. 69, of the acts of the first extra session of 1933, quoted in the majority opinion, authorizing the Refunding Board "to compromise or settle any suit or claim, etc. * * * growing out of any contract between the Highway Commission and any person * * *," can only relate to disputed matters and clearly has no reference to those admittedly correct. How this provision, or the one in the same section referred to by the majority, providing that funds due the Highway

Commission on any settlement or compromise shall be paid into the State Treasury for credit of the Bond Refunding Fund, gives any support to the conclusion reached, I do not understand. The opinion, after citing these above provisions, cites as conclusive of the conclusion reached, section 4, act 18, *supra,* which provides that "this act shall not validate any claim, etc. * * * issued under, or pursuant to any illegal contract * * *." In what manner is this authority? I insist that, notwithstanding repeated intimations in the opinion to the contrary, the warrant involved is expressly admitted to be regular and valid in every particular, and therefore all the provisions quoted have no application, for they deal with claims, the validity of which are brought in question. What I have just said is apposite to section 15 of act No. 11, *supra,* quoted and relied upon by the majority opinion. The provisions quoted are those which empower the Refunding Board to refer claims to the Audit Commission growing out of any contract between the Highway Commission and any person, to the end that the Audit Commission may investigate and report "as to the validity of any such item." Later in the opinion, section 10 of act No. 11 is quoted and cited, this being in effect the same as the provisions of section 4 of act No. 18, which I have already noted. The majority cite and quote in full the preamble of act No. 14 of the Acts of 1933 as persuasive of the position taken. It will be seen from this preamble that the appropriation provided by the act relates only to the contest of invalid claims or those which may be thought to be such and which are being contested in the courts.

From the whole argument made in the majority opinion and from an examination of the provisions of the statute cited, it seems obvious that the majority have misconceived both the nature of the subject-matter of this suit and the view entertained by the minority. We emphasize again that there has never been any contention that the State has validated claims otherwise invalid, nor has any one ever thought, except the majority, that the warrant involved should be classed with "other illegal contracts." It is expressly admitted in the complaint,

as quoted in the majority opinion, that "the complaint alleged that the warrant was issued to the contractors for construction work performed under a valid contract upon a voucher duly and legally issued by the Arkansas State Highway Commission and was, on the same date of its issuance, indorsed and delivered to the People's National Bank in due course of business and for value."

The minority merely insist that, since the warrant was properly and regularly issued, based upon a valid contract, the State has on four occasions by legislative enactment guaranteed to the holders of that class of claims the right to have the same refunded in the manner prescribed by law. By section 17 of act No. 15 of the Acts of 1932, by sections 1 and 5 of act No. 167 of the Acts of 1933, by section 2 of act No. 18 of the Special Session of 1933, and by section 39 of act No. 11 of the Special Session of 1934, the settled policy of the State has been declared in unequivocal language to be (section 9, act No. 11, Special Session 1934, the latest expression of the legislative will) that "the legal holders of all valid claims against the Highway Commission growing out of contracts for the construction and maintenance of highways shall be entitled, upon presentation to the Refunding Board of such short term notes, State bonds, or other evidences of said claims, to receive in exchange therefor funding notes of the character hereinafter provided for in this section in an amount equal to so much of the face value of such short term notes, State warrants, or claims presented, payment of which is not otherwise provided for by this act." The language just quoted was but a re-enactment and re-statement of the privilege given to legal holders of valid warrants provided for in the acts cited, *supra,* dealing with that subject.

The overpayment under an invalid contract which is sought as a set-off to the warrant involved was made at least a year and six months before the issuance of the warrant held by the People's National Bank. The State therefore had ample opportunity to determine the amount of overpayment before the issuance of the $2,500

warrant, admittedly valid, which is sought to be refunded. The State ought not, by reason of the dereliction of its officers, to insist now on having the set-off against a valid warrant in the hands of an innocent purchaser. The moral obligation rests upon it, as well as individuals, to do justice. This obligation has been recognized by its Legislature in the provision of the acts last above referred to, and no judicial interpretation ought to refine away its express purpose. To do so, I submit, turns the law awry and violates principles of natural justice.

I am authorized to say that Justices Mehaffy and McHaney join in the dissent, and concur in the views I have expressed.